*IN THE UNITED STATES DISTRICT COURT*

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID<br><br>**"Mariah Vieni" with User ID 100008569065384 (Target Account 10)**<br><br>**"Mariah Vieni" with User ID 100011864514089 (Target Account 11)**<br><br>THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No.  22-mj-08143-TJJ<br><br>**Filed Under Seal** |

### AFFIDAVIT AND APPLICATION IN SUPPORT OF A SEARCH WARRANT

I, G. Matthew Kenyon, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the FBI and have been since October 15, 2007. During my time as an FBI Special Agent, I have served the FBI in variety of locations with a variety of different responsibilities. I am currently assigned to the Kansas City Division's Gang Squad.  As an FBI Special Agent assigned to the Gang Squad my official duties include, but are

not limited to investigation into gangs, criminal violations of the Controlled Substances Act, organized crime, violent crime, and ongoing criminal enterprises.  While conducting these investigations, I have been the affiant on a various types of search warrants.  I have conducted interviews, controlled drug purchases, surveillances, search warrants and arrest warrants.

3.      The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. This Affidavit does not purport to set forth all of my knowledge of or investigation into this matter.

## FACEBOOK

4.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts through which users can share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

5.      Facebook asks users to provide basic contact information, either during the registration process or thereafter. This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

6.      Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information in the user's account available only to himself or herself, to other specified Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. Facebook accounts also include other

2

account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

7.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

8.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

9.    Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or

she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

10.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

11.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

12.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

13.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

14.    Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or

4

head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and creator of the group. Facebook also assigns a group identification number to each group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and administrator, as well as the current status of the group profile page.

15.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

16.     Facebook also retains IP address logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.

17.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service used, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account,

such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

18.    Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

## FACEBOOK USER IDs

19.    Facebook account users have display names which are created by the user and are often not unique from other Facebook users with the same name, preventing Facebook from being able to uniquely identify an account with the display name. Display names appear on the User's profile page and are searchable within Facebook by other Facebook users.  However, all Facebook accounts have a unique webpage URL address and USER ID.  The user ID is commonly 15-digits long unless the account is a long-term account created in Facebook's infancy as a social media platform wherein the user ID may be 10 digits or shorter.  The webpage URL address is visible when viewing the users' profile page which is often available to observe even if the remainder of the account is restricted by privacy settings.  The URL will display either a unique vanity name such as www.facebook.com/john.doe.24 where "john.doe.24" is the vanity name, or the user ID such as www.facebook.com/100012345678912 where 100012345678912 is the user ID.  The user ID cannot be changed by the user without creating an entirely new account and is therefore the most reliable identifier for an account.

6

20.    With the Facebook URL, an individual can easily identify the associated Facebook User ID when using an open-source tool like "lookup-id.com." Lookup- id.com allows internet users to locate a Facebook User ID by entering the Facebook URL address into the search function on the website.  This search tool simply searches for and locates the user ID within the source code of the Facebook profile page and can be replicated by manually reviewing the source code.  If a vanity name is displayed in the URL, the user ID can be verified by entering it into the web address following www.facebook.com such as displayed above which will take the investigator to the same page.

## BACKGROUND

21.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is made in support of an application for a search warrant to search the Target Accounts, more fully described in Attachment A, attached hereto and incorporated herein by reference, for evidence, instrumentalities, and proceeds, more fully described in Attachment B, attached hereto and incorporated herein by reference, for violations of Title 18 United States Code 1201(a) and 2; Title 21 United States Code 846; and Title 18 United States Code 924(c). Although this search warrant seeks Facebook Account information for Target Accounts 10 and 11, this Affidavit outlines evidence related to the related Target Accounts 1-12, as information regarding all relevant Target Accounts is necessary for a full understanding of the activity establishing probable cause herein.

22.    Between December 2019 and April 2021, DAVID CARR, JAMES POTERBIN, BRANDON WEST, RANDI SERNA, BRIAN SPAULDING, and MIKE HUGGINS were indicted for violations involving Title 18 United States Code 1201(a) and 2; and Title 21 United

States Code 846 and 841; and Title 18 United States Code 924(c).  Between April 2021 and September 2021, SERNA, WEST, HUGGINS, and SPAULDING pled guilty to charges associated with these indictments.  Based on the facts set forth in this affidavit, I believe there is probable cause to believe that evidence, instrumentalities, contraband or fruits of these crimes, further described in Attachment B, are on the Facebook **Target Accounts 10-11**.

23.    On June 6, 2022, the Honorable Judge James signed search warrant 22-mj-08100 TJJ authorizing the search of four Facebook User Accounts including:

**"Mariah Vieni" with User ID 100008659065384 (Target Account 1)**

**"Mariah Vieni" with User ID 10001186451408 (Target Account 2)**

**"Mariah Vieni-Huggins" with User ID 100043141544061 (Target Account 3)**

**"Mariah Anne Huggins" with User ID 100017780896978 (Target Account 4)**

24.    On July 7, 2022, I received the results from Facebook for three (**Target Accounts 1, 3 and 4**) and began reviewing them.  On July 13, 2022, I discovered two errors on the original search warrant affidavit regarding **Target Accounts 1 and 2**. Regarding **Target Account 1**, two of the digits in the USER ID were mistakenly transposed; The correct USER ID is 10008**56**9065384. Regarding **Target Account 2**, the last digit of the USER ID was mistakenly omitted; The correct USER ID is 10001186451408**9**.

25.    As set forth below, this affidavit seeks to obtain search warrant authorization for the Target Accounts identified by their correct USER IDs. For simplicity, the accounts are identified as **Target Accounts 10 and 11**.

## PROBABLE CAUSE

26.    In September 2019, SA Kenyon and others began investigating an allegation that a victim was kidnapped, tortured, and held for a $500 ransom after a $500 methamphetamine

deal went bad. As further explained below, after Mariah Vieni was robbed during a $500 drug deal, the individuals who provided the money assumed Vieni robbed them. They, in turn, tortured and held for ransom Vieni's boyfriend, Dustin Baugher, before releasing him approximately two days later. This affidavit is intended to show there is sufficient probable cause for the requested warrant and does not detail all the facts about this matter. A summary of the evidence established to date is as follows:

27.     On April 18, 2019, Dustin Baugher and Mariah Vieni went to 1605 Ruby Ave in Kansas City, Kansas. Other individuals present included RANDI SERNA, BRYAN SPAULDING, and BRANDON WEST.  On April 18, 2019 at 7:03 PM, Vieni (using **Target Account 4**) reached out to Denise Byrd via Facebook messenger and said "Agt I need 2 thangs." Byrd responded saying "Things?" Vieni responded back saying "Ya I need two." Byrd responded saying "K." Vieni asked "What's the ticket." Byrd responded saying "Ur boy? 500." Vieni responded saying "Pull up I got the money." Byrd sent Vieni two messages saying "Come on" and "White car[1]." Based on the witness statements, I believe Byrd and Vieni were using slang terminology to arrange a two-ounce methamphetamine deal for $500.  At approximately 7:36 PM, Vieni left the residence with $500.00 (received from WEST) to purchase methamphetamine and was expected to return with the methamphetamine shortly thereafter.

28.     The FBI identified **Target Account 4** via a search of Byrd's phone which revealed the Messenger messages between Byrd and Vieni as well as the User ID for **Target**

---

[1]The referenced Facebook Messenger messages between Byrd and Vieni occurred on April 18, 2019 between 7:03 PM and 7:36 PM.  Not all of the exchange between Byrd and Vieni is included in the above narrative, only a few messages to show a drug transaction was arranged.  Statements from BOTH Byrd and Vieni corroborate that Byrd arranged a two-ounce drug deal with Vieni for $500.  Byrd further indicated she (Byrd) arranged the deal as a ruse to steal the $500 from Vieni.

**Account 4**. Using Google, I identified three other Facebook accounts associated with Vieni including **Target Account 10, Target Account 11**, and **Target Account 3**. I am confident Vieni was the user of these accounts because I recognize the profile pictures as Vieni, whom I have met on several occasions. After identifying the accounts, I was able to identify the unique User ID for each of these accounts using www.lookup-id.com. Based on my training and experience, I know that people involved in criminal activity, such as drug dealing, often use more than one Facebook account.  Since I know that Vieni was using at least one Facebook account to discuss various elements of the crimes for which POTERBIN, CARR, HUGGINS, WEST, and SERNA have been charged, I believe it is likely Vieni was using one or more of the other accounts to discuss these matters during the kidnapping.  Being able to identify these conversations, should they exist, would be critical to expand my understanding of the events that are the subject of this matter.  Based on the investigation, we are aware that a critical Facebook messenger thread between Vieni and Baugher occurred during the offense.  Agents did not locate the known thread on Vieni's **Target Accounts 3 or 4**, therefore I believe Vieni's **Target Accounts 10 and 11** were likely used by Vieni to send the critical Facebook messenger threads to the victim during the offense.

29.     After Vieni left the Ruby residence to obtain methamphetamine from Byrd, Byrd took \$480[2] of the \$500 from Vieni but did not provide the methamphetamine.  WEST, SERNA and SPAULDING held Baugher at the house due to their belief that Vieni stole their drug

---

[2] Both Byrd and Vieni stated that Byrd gave \$20 back to Vieni at the time Byrd took the money from Vieni. Vieni stated she asked Byrd for \$20 back so she could make \$20 on the drug deal. Byrd stated she gave Vieni \$20 out of guilt because she (Byrd) was going to rob Vieni.

money. Because they assumed Vieni stole the money, they held Baugher against his will to motivate Vieni to return the money or deliver the methamphetamine.

30.    On April 18, 2019 at 9:07 PM, Vieni (**using Target Account 4**) reached out to Byrd saying "Oh yeah nigga it's like that." I believe this was an attempt by Vieni to confront Byrd after she (Vieni) realized Byrd had robbed her.

31.    Around this time in the evening, it became clear to Baugher that he was not free to leave. WEST and SPAULDING kept Baugher at the house at gunpoint.  When Vieni returned to the residence, SPAULDING fired at least one shot at her vehicle, and she quickly left[3]. Shortly thereafter, Spaulding left and DAVID CARR and JAMES POTERBIN arrived at the residence.

32.    At or about this time, Dustin Baugher sent the two following Facebook messenger private messages to Vieni:

      a.   "I'm surrounded someone came in uth car parts."

      b.   "This ain't bout to go good theyre all the way ready and green lighin. I love you nigga it ain't safe unless ur good. If not dont come here just go."

33.    Based on the totality of the evidence and the context, I believe Baugher sent these messages to Vieni after CARR and POTERBIN arrived at the residence[4]. Based on my experience in working gang matters and street crimes, I believe that "green lighting" is a slang term that often means someone has ordered a murder.

---

[3] SPAULDING's guilty plea included an admission of firing this shot at Vieni.

[4] Although Vieni provided screenshot images of messages between Vieni and Baugher, not all of the messages display time stamps. Having access to the requested logs would enable investigators to have a better understanding of the timing of the messages between.

34.     The FBI obtained the messages between Vieni and Baugher in the form of screenshots which were helpful in determining the content of the messages sent, but not helpful in determining the User IDs for the account holders. I later determined that Baugher, like Vieni, has multiple Facebook accounts including **Target Accounts 6-8**. Using www.lookup-id.com, I identified the User IDs for **Target Accounts 6-8**. Furthermore, I recognize the profile pictures on **Target Accounts 6-8** as Baugher who I have met on multiple occasions. Based on the screenshots provided, I know that Baugher was using Facebook Messenger to communicate with Vieni regarding the events that are the subject of this matter. However, I do not know which one of his accounts he was using. Being able to identify the conversations on **Target Accounts 6-8** would be critical to expand my understanding of the events that are the subject of this matter.

35.     When Vieni did not return with the $500 worth of methamphetamine, the individuals waiting at the Ruby residence ordered Baugher to a room, his hands were zip tied behind his back, and his head was wrapped in a T-shirt and duct taped.  CARR, POTERBIN, WEST and SERNA tortured Baugher and held him for ransom hoping Vieni would return the money.  Medical records established that Baugher was severely beaten, stabbed, his finger nearly severed, and he was shot. Based on statements from Vieni, Vieni could hear Baugher screaming in the background as the kidnapper's demanded Vieni return their money. On April 18, 2019 at 11:25 PM, toll records show a seven-minute phone call from Vieni's phone to Baugher's phone which is consistent with Vieni's statement.

36.     A few minutes later at 11:35 PM, CARR (using **Target Account 9**) sent Byrd a Messenger message saying "9136362805." Based on the investigation, I know that phone number '913-636-2805' was used by CARR during this time period. At 11:38 PM, Byrd

12

attempted to place a Facebook Messenger call to CARR, but the call was missed.  A few minutes later at 11:46 PM, Vieni (using **Target Account 4**) reached out to Byrd on Facebook and sent the following two private messages:

       a.  "They're torturing him !!!!"

       b.  "U don't believe me call dysmay and the dude will answer[5]"

37.     At some point, and for an unknown duration, Baugher believes he was left in the residence alone because he could not hear anyone in the house.

38.     On April 19, 2019 at 9:18 AM, Vieni sent a Facebook Messenger Message to SERNA that said "Tell your fuckin boy I got [the] moeny." The FBI originally obtained the messages between Vieni and SERNA in the form of screenshots.  After receiving the results of search warrant 22-mj-08100 TJJ, I discovered the USER ID of the Facebook account used by SERNA to communicate with Vieni is 100034037161137, **Target Account 12**[6].

39.     On April 19, 2019 at 9:38 AM, Byrd sent a private Facebook message to CARR (using **Target Account 9**) saying "Look idk what tf any of you have got going on, but leave me tf outta it! Y tf is Mariah hitting me up offering 500 for her friend? Idgaf just dont involve me in a petty $500 jack move. Rs" A few minutes later at 9:40 AM, Vieni sent a Facebook Messenger Message to SERNA that said "Guess he doesn't want his money"

---

[5] "Dysmay" is Baugher's nickname. In this message, I believe "the dude" refers to either CARR or POTERBIN who was demanding Vieni return the $500.

[6] On June 6, 2022, the Honorable Judge James signed search warrant 22-mj-8103 authorizing the search of SERNAs Facebook account with USER ID 100004046800176, identified as **Target Account 5**. I had originally identified this account as belonging to SERNA via a Google search.  However, after reviewing the messages from **Target Account 3** (obtained via 22-mj-8100), I discovered **Target Account 12** was the account SERNA was using to communicate with Vieni.

40. On April 19, 2019 at 11:04 AM, Vieni, using **Target Account 4**, continued to reach out to SERNA via Facebook Messenger and sent a message saying "Hisdads gonna call the cops unless we make this deal." On April 19, 2019 at 1:56 PM, Baugher's father, Mitchell Baugher, placed a 911 emergency call to the Kansas City, Kansas Police Department regarding the welfare of Baugher. Kansas City, Kansas Officer Brandin Anderson responded to Mitchell Baugher's residence to take a report but did not follow up on the information Mitchell Baugher provided.

41. On April 20, 2019, Vieni continued her attempts to find someone who could help free Baugher. On April 20, 2019 at 11:29 AM, Vieni messaged SERNA again, using **Target Account 4**, and said "Hes still missing." Another message from Vieni to SERNA said "Will you please go down there n see if hes there[7]? On April 20, 2019 at 1:27 PM, SERNA responded "Ok i went by yesterday and didn't see him . . No one was there or answered." Based upon my review of the messages obtained via 22-mj-8100, I know that SERNA was using **Target Account 12** to communicate with Vieni.

42. Vieni also reached out to Chelsie Smith for help with paying the methamphetamine money back. Sometime in the afternoon or early evening on April 20, 2019, Chelsie Smith arrived at the house with Joe Curtis. Smith forced her way into the house and threw $300 into the living room. At the time she arrived, WEST was the only other person in the house. Smith removed the restraints from Baugher. She and Curtis helped Baugher out of the

---

[7] A portion of the quoted messaged was omitted from the affidavit due to it pertaining to the relationship between Vieni and Baugher. However, the portion included is quoted exactly as it appears in the screenshot of the communication.

house and into Smith's vehicle.  Before they left, MIKE HUGGINS arrived at the residence. HUGGINS collected the money Smith threw and provided it to WEST.

43.     Following the release of Baugher from the residence, neighbors observed two white males (later identified as WEST and HUGGINS) running from the house to a black Nissan Altima carrying bags. After WEST and HUGGINS got into the car and drove away, the house burned down. The Kansas City, Kansas Fire Marshal determined the fire was intentionally set.

44.     Evidence has been collected during this investigation which corroborates the victim's statement, including medical records, witness statements, phone records, and defendant statements. Based on the evidence collected to date, investigators know that Facebook Messenger was used by Vieni, Byrd, CARR, SERNA, and Baugher discussing different aspects of the aforementioned crimes. Although investigators have obtained the content of some of these communications, investigators would have a more complete picture of the crimes committed if they were able to obtain the full communications sent via Facebook Messenger leading up to and during the crimes.

### CONCLUSION

45.     Based on the foregoing, I request the Court issue the proposed search warrant for **Target Accounts 10-11**.

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

47.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court in the United States District of Kansas is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).]

48.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

G. Matthew Kenyon
Special Agent
FBI

Subscribed and sworn to before me on this 15th day of July 2022, after first having been transmitted via reliable electronic means.

Honorable Teresa J. James
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**Property to Be Searched**

**Facebook, Inc.**

Part I.           **Location to Be Searched**

This warrant applies to information associated with the following Facebook User IDs:

**"Mariah Vieni" with User ID 100008569065384 (Target Account 10)**

**"Mariah Vieni" with User ID 100011864514089 (Target Account 11)**

That is stored at the premises owned, maintained or operated by **Meta Platforms, Inc.**, located at 1601 Willow Road, Menlo Park, California.

Part II.              **Items to Be Seized**

A.       **Information to be disclosed by Meta Platforms, Inc.**

To the extent that information described in Part II of Attachment A is within the possession, custody, or control of Meta Platforms, Inc., operating the Facebook social media application ("Facebook"), including any messages, records, files, logs or information that has been deleted but is still available to Facebook, or has been preserved pursuant to a request under Title 18, United States Code, Section 2703(f), Facebook is required to disclose the following information to the Government for each User ID listed in Part I of Attachment A:

i.        All contact and personal identifying information, including full name, user identification number, birth date, gender, contact email addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

ii.       All associated Facebook accounts and users which have been identified by way of mechanical cookie, persistent cookie, mobile advertising ID, or other means;

17

iii.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

iv.      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

v.      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

vi.      All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

vii.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

viii.      All past and present lists of friends created by the account;

ix.      All records of Facebook searches performed by the account;

x.      All information about the user's access and use of Facebook Marketplace;

xi.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

xii.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**B.  Information to be seized by the Government**

All information described above in Section A that constitutes fruits, evidence and instrumentalities of violations of Title 18 United States Code 1201(a) and 2; Title 21 United States Code 846 and 841 and Title 18 United States Code 924(c) from April 18-22, 2019 including,

18

for each account or identifier listed on Attachment A, information pertaining to the following matters:

      i.      Records, communications, documents, or photographs, in any form, which evidence the ownership and identify the user, or location of the user of the account;

      ii.      Records, communications, documents, or photographs, in any form, regarding the planning, execution, or concealment of violations of federal law as identified above; and

      iii.      Records, communications, documents, or photographs, in any form, which contain saved directories of names, addresses, and contact information of associates of the user.

As used above, the terms "records," "communications," and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

19